**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY IGWE, as the Administrator** | : | **CIVIL ACTION** |
| **of the Estate of PRISCILLA L.** | : | |
| **ROBINSON** | : | |
| | : | |
| **v.** | : | **NO. 16-1403** |
| | : | |
| **JEREMY SKAGGS,** *et al.* | : | |

**KEARNEY, J.**                                                                                  June 28, 2017

## <u>MEMORANDUM</u>

Police officers driving through intersections in response to an emergency must be alert to the presence of innocent drivers possibly unaware of the officer's perceived need to speed through a red traffic signal. Police departments may purchase equipment to transmit a signal to the traffic controller device requesting a change in the color of approaching traffic lights. Our society faces difficult liability questions when the officer's response leads to an intersection collision causing the death of an innocent driver who just happened to be lawfully crossing the intersection when the officer sped through a red light. After review of extensive appendices in support of summary judgment motions filed by the officer, his public employer, and the equipment seller, we find no genuine issue of material fact on the equipment seller's liability for design defect or duty to warn or the public employer's liability for negligence or punitive damages and dismiss the equipment seller and common law claims against the public employer. But disputed material facts require a jury's review of the officer's potential liability for punitive damages for negligence and the public employer's civil rights supervisory liability for the officer's possible conscience shocking conduct or for failing to train officers on how to operate their vehicles when responding in "Emergency Response mode" as distinguished from pursuit.

## I.    Undisputed Facts[1]

Monroeville Police Officer Jeremy Skaggs drove his police vehicle at a high rate of speed into a car driven by Priscilla Robinson at an intersection in the Municipality of Monroeville ("Monroeville") ("the intersection").[2] Ms. Robinson died the next day of injuries sustained in the collision.[3] Her husband, Anthony Igwe, seeks damages against Officer Skaggs for negligence, his employer Monroeville for supervisory liability under federal civil rights laws, and against Global on products liability and negligence theories as the company selling the transmitter system bought by Monroeville.

### A.    December 8, 2014 midday collision between Officer Skaggs and Ms. Robinson.

Around noon on December 8, 2014, Monroeville police officer Jeremy Frisk called dispatch to check a license plate on a car he followed while driving on State Route 22.[4] After being advised by dispatch the license plate's registration did not match the car he followed, Officer Frisk suspected a stolen vehicle.[5] Around this time, Officer Skaggs heard over the radio Officer Frisk's plan to stop the vehicle.[6] At approximately 12:01:20 p.m., Officer Frisk called out "Unit 991 priority!" and dispatch gave a "991 go ahead" to Officer Frisk.[7] Officer Skaggs testified a "priority" call means an emergency situation of high importance.[8]

After hearing Officer Frisk call "priority," Officer Skaggs activated his emergency lights and sirens and "elected" to travel to Officer Frisk's location to provide back-up.[9] Officer Skaggs considered himself a back-up officer under Monroeville's "Emergency Response mode" provided in the Monroeville Police Department's Policy and Procedures Manual ("Monroeville Policy").[10]

It is undisputed Officer Skaggs was not involved in a pursuit at the time of the collision.[11] Instead, Officer Skaggs testified he believed an "Emergency Response" under the Monroeville

Policy applied because, when he heard Officer Frisk call "priority," it meant Officer Frisk engaged in a pursuit where there is a risk or potential for injury and a serious crime was in progress.[12] Monroeville police officer William Supancic also responded as a back-up to Officer Frisk, activating the lights and siren on his police car.[13]

At approximately 12:02:34 p.m., Officer Frisk reported over the radio the suspect he followed appeared to reach around in the vehicle and act awkwardly.[14] An audio recording reflects the radio transmissions.[15] However, the time stamps reflected in the audio recordings are not consistent with the time stamps in the video recording from Officer Skaggs's patrol car, a discrepancy Monroeville attributes to the two systems' link to different computer servers at the Monroeville Police Department.[16] According to the audio tape, at 12:02: 46 p.m. Officer Frisk radioed the suspect "bailed out" of the vehicle and fled on foot.[17] According to the audio tape, at 12:03:43 p.m. Monroeville dispatch asked Officer Skaggs to proceed to Officer Frisk's location.[18] According to the audio tape, at 12:03:55 p.m. Officer Frisk reported the suspect had something in his hand, possibly a firearm and requested police units.[19] Officer Skaggs believed this report indicated the suspect may have been reaching for a weapon or contraband.[20]

The video recording in Officer Skaggs's vehicle shows his collision with Ms. Robinson's car occurred at 12:02:58 p.m.[21] Officer Skaggs entered the intersection against a red traffic signal.[22] Monroeville admits the traffic light at the intersection did not change to green despite evidence of a preemption request from the Opticom system because Officer Skaggs likely "over ran" the signal, entering the intersection against a red traffic light.[23] Officer Skaggs testified he did not rely on the Opticom system as he approached the intersection.[24]

The video recording from Officer Skaggs's vehicle shows he applied the brakes at 12:02:56.[25] When he applied his brakes, Officer Skaggs estimated he was seven car lengths from

the intersection.[26] Officer Skaggs operated his vehicle 57 miles per hour approximately 0.5 seconds before colliding into Ms. Robinson.[27]

**B. Monroeville's Opticom system.**

Monroeville purchased an Opticom Emergency Vehicle Preemption System ("Opticom system") which, among other things, purports to assist police and emergency vehicles approaching traffic signals. Global's predecessor, 3M Company, manufactured the Opticom system in use at the intersection.[28]

The Opticom system consists of three parts: an emitter placed in the emergency vehicle; a detector located at the traffic signal; and a phase selector.[29] The emitter is located in an emergency vehicle and is activated by the switching on of emergency lights and siren. The emitter sends out an infrared signal, or "pulse," in front of the vehicle.[30] The detector, located on the traffic signal, detects the emitter's signal once the vehicle comes within a detectable range, and relays the signal to a phase selector located in the traffic controller cabinet at the intersection.[31] The phase selector submits a "preemption request" to the traffic controller.[32] The traffic controller is neither owned nor operated by Global.[33]

When it receives the preemption request from the Opticom system, the traffic controller determines if and when the traffic signal will change.[34] The Opticom system itself does not change the traffic signal.[35] It is possible to "over run" the Opticom system; that is, an emergency vehicle may encounter a red traffic signal if it travels faster than the time it takes for the signal to change to green.[36]

The possibility of "over running" or "out running" the Opticom system and whether Global properly warned against it is the issue in Mr. Igwe's products liability claim against Global. Global provided a driving training package entitled the "3M Opticom Priority Control

System, Driver Preparation Instructor Guide" ("Instructor Guide") made available to all purchasers and end users of the Opticom system.[37] The Instructor Guide provides "Notes to Instructors," including a section on its purpose to "provide emergency vehicle drivers with a logical, complete discussion of how to appropriately use the Opticom system"; "provide a concise, self-contained resource for presenters and trainers"; "raise and answer frequently asked questions"; "instill respect for the benefits and limits of the system"; and "identify, and thus encourage safe, responsible emergency vehicle driving with the system."[38]

The Instructor Guide contains sections on the "Fundamentals" of "traffic control" and "911 support"; an explanation of the "priority signal control"; an explanation of the "system" itself including the emitter, detector, and phase selector; and "System Variables."[39] The section on "System Variables" explains the time delay limitations. This includes an explanation it may take five, ten, or even fifteen seconds or more from the time the detector receives a single from the emitter until the controller grants the green light "if it grants it at all."[40] "System Variables" include time delay limitations, warning "having the emitter activated does not instantly give you a green light," and warning of "planned 'delay' times" depending on a variety of factors such as "street width, number of lanes, presence of protected turning lanes with green arrows, progression of traffic, synchronization with other signals – even the time of day,"[41] "intersection phasing,"[42] "installation pattern,"[43] "multiple use" of the Opticom system used by several agencies such as EMS, fire, and police,[44] and "neighbor communities" that may not have the Opticom system[45] The Instructor Guide contains sections on "Performance Variables" including "interacting agents" such as other drivers, public transportation, pedestrians, bicyclists, and emergency responders all using the roadways and "system checks" regarding system maintenance.[46]

Although all parties contend the Instructor Guide does not warn about the possibility of over running the Opticom system, the "Frequently Asked Questions" section includes:

"Can I overdrive the system?" With the response:

Yes, because delay times are built-in to make the intersection safe for all civilian traffic, you can come upon intersections before the controller cycles to the green light. However, the system does react rapidly enough to provide much more efficient and faster travel while maintaining the safest possible conditions for everyone concerned.[47]

And the question: "Can I use the system for hot pursuit?" With the response:

There are communities where police have used their priority control systems to "steer" runaways and help keep other traffic from getting in the way. However, it's likely that at higher speeds, both the officer and the felon being pursued would be running red lights.[48]

The Instructor Guide advises drivers "should always drive green lights"; an "agency can devise a pattern of flashes and steady lights to communicate what to expect at the intersection" with "confirmation lights"; but other than confirmation lights, "there is no way of telling exactly what the signal will do, no way of anticipating a green within a certain time frame."[49]

Global's witness Pat Cosgrove testified to a number of variables affecting the amount of time between the traffic controller's receipt of the preemption request to the actual signal change, including the stage of the light cycle at the time the preemption signal is detected, the specific sequence settings of the traffic light, and pedestrian crosswalks.[50] There are various range settings on the Opticom system, but the detection of the emitter's signal does not and cannot always occur within a specific and definite distance from the detector because of numerous variables including, a potential obstruction between the detector and the emergency vehicle, weather conditions, maintenance history of the Opticom system, and topography of the area.[51]

Monroeville Police Chief Douglas Cole testified Monroeville's Policy on the Opticom system derived from a "manual" or "trial policy that they provided or came from 3M."[52] Although

he could not identify the actual policy, Chief Cole testified 3M "provided us with manuals" and "I have a file that has 3M explaining the Opticom. So there are manuals."[53] Dominic LaGorga, senior foreman of Monroeville's public works and who is responsible for maintaining traffic signals within the municipality, testified he has "installation manuals" from Global and 3M.[54]

A section of Monroeville's Policy addresses the Opticom system, including a warning:

> Opticom can be over run by increasing the speed of the emergency vehicle using the device. No set speed has been determined, however you are warned not to anticipate the light changing.[55]

There is no dispute Global provided a timing chart to Opticom installers identifying the distance an emergency vehicle from a traffic signal and the speed at which the emergency vehicle travels to ensure a green traffic signal at the time the emergency vehicle reaches the intersection.[56] Although Mr. Igwe admits Global provided a timing chart to installers of Opticom systems, he asserts there is no evidence Monroeville, through Chief Cole or any other member of the Monroeville Police Department, received the timing charts in an "installation manual." Mr. Igwe cites Chief Cole's deposition testimony where he denied ever having seen Global's "timing chart"[57] and Officer Skaggs's deposition testimony where he denied having been provided with an owners' manual or operations manual.[58]

Mr. Igwe points to additional materials prepared by Global but which were not provided to Monroeville: "Anticipate the Unexpected"; "Moving at the Speed of Life"; and "Traffic Control Devices."[59] Chief Cole testified he does not recall seeing the "Anticipate the Unexpected" brochure, including sections entitled "driving training program" and "customized seminars" offered by Global.[60] Chief Cole testified he was never aware of 3M offering to provide customized seminars for training on the Opticom system, or periodic training updates, or audio visual training.[61] There is no dispute the additional materials are not included in Monroeville's

Policy on the Opticom system.

**C. Monroeville's Policy and Procedures Manual.**

Chapter 28 of Monroeville's Policy pertains to "Vehicle Operations." Section 28.1 is the

"Policy Statement" including "General Definitions" at Section 28.1.1 and provides in part:

> For purposes of this policy: It is the policy of this Department to always
> drive safely and comply with state and local laws. Officers shall have the
> duty to drive with due regard for the safety of all persons. Furthermore, no
> duty is so important and no call so urgent that officers cannot proceed with
> caution and arrive safely.[62]

The term "Emergency Response" is defined as:

> driving in a more expeditious but safe manner according to state law with
> continuous use of emergency equipment when responding to a situation
> that is believed to be either an immediate life-threatening or serious bodily
> injury incident or when involved in a vehicular pursuit according to
> department policy.[63]

Section 28.9 is the "Response Mode Classification" intended to be "illustrative and not

exclusive" including "Emergency Response" defined as:

> Emergency Response is generally authorized in a situation that is believed to be
> in-progress and either an immediate life threatening or serious bodily injury
> incident, such as:
>
> A. A request to a possible life threatening situation or one in which it appears that
>    there may be seriously injured persons in need of medical attention.
>
> B. A serious crime in progress.
>
> C. An unusual or serious incident that mandates an immediate response by staff
>    or other specialty personnel (i.e., command staff, hostage negotiators, etc.).
>
> D. An emergency escort mandated by the totality of the circumstances (i.e.
>    critically injured persons, etc.)
>
> Officers shall follow the Use of Emergency Warning Devices as defined in this
> chapter when responding in an emergency response mode.[64]

Section 28.12 is the "Pursuit of Motor Vehicles" policy and includes a "Policy Statement" referencing Pennsylvania statute governing drivers of emergency vehicles, 75 Pa.C.S.A. § 3105.[65] Section 3015 allows drivers of emergency vehicles to, under certain circumstances, disregard general traffic regulations but does not "relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons."[66] The "Pursuit of Motor Vehicles" section additionally contains a subsection outlining the conditions under which pursuits must be terminated.[67]

## II.    Analysis[68]

Ms. Robinson's husband Anthony Igwe, as the administrator of her estate, alleges a *Monell* claim against Monroeville for failure to train and supervise under 42 U.S.C. § 1983, as well as state law claims of negligence and vicarious liability against Monroeville and a state law claim for negligence against Officer Skaggs. Mr. Igwe brings strict products liability and negligence claims against Global arguing the Opticom system can be outrun by emergency vehicles depending on their speed and the stage of the light cycle at the time the system is triggered; the Opticom system is inherently dangerous and unsafe for first responders such as Officer Skaggs because emergency responders rely on the system to give green lights when the system can be outrun which could cause injury; the Opticom system failed to indicate to the control module in Officer Skaggs's police vehicle the signal had not yet cycled and turned to green for his direction of travel as he approached the intersection; the Opticom system did not perform as intended; Global failed to warn Monroeville the system could be out run; and the Opticom system lacked elements necessary to make it safe for its intended use.[69]

Officer Skaggs moves for partial summary judgment seeking to dismiss punitive damages against him on the state law negligence claim.[70] We deny his motion. Monroeville seeks

summary judgment on the state law vicarious liability claim on punitive damages only and on the state law negligence claim. Mr. Igwe concedes the state law negligence claim against Monroeville is barred by Pennsylvania's Political Subdivision Tort Claims Act,[71] and we grant summary judgment on this issue. Monroeville seeks summary judgment on the § 1983 *Monell* claim and we deny this motion finding genuine issues of material fact. Global moves for summary judgment on Mr. Igwe's strict products liability and negligence claims under Pennsylvania law. We grant its motion as there are no disputed issues of fact concerning the absence of a design defect or failure to warn.

### A. Fact issues preclude summary judgment on Mr. Igwe's demand for punitive damages on the negligence claim against Officer Skaggs.

Under Pennsylvania law, punitive damages are permitted for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."[72] "[A] punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."[73] We find questions of fact regarding Officer Skaggs's response, including what and when he knew or believed from the radio recordings immediately preceding the collision with Ms. Robinson's car, precluding summary judgment. The jury will evaluate his state of mind testimony.

### B. We grant summary judgment dismissing the state law claims against Monroeville.

#### 1. Summary judgment is granted as to punitive damages on the state law vicarious liability claim against Monroeville.

Our January 30, 2017 Order dismissed all claims for punitive damages against Monroeville on Mr. Igwe's concession he cannot state a claim for punitive damages against Monroeville under § 1983. Monroeville seeks summary judgment as to punitive damages on Mr.

Igwe's state law vicarious liability claim. Under the Pennsylvania Political Subdivision Tort Claims Act (the "Tort Claims Act"), municipalities are not liable for punitive damages.[74] Summary judgment is entered in favor of Monroeville on punitive damages in the state law vicarious liability claim.

### 2. Summary judgment is granted in favor of Monroeville on the state law negligence claim.

Mr. Igwe also brings a negligence claim against Monroeville for its failure to train, supervise, direct, and control its police officers regarding safe driving techniques and on the Opticom system. Local agencies are immune from tort liability under section 8541 of the Tort Claims Act.[75] Section 8542 identifies exceptions to governmental immunity. "Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed."[76]

Mr. Igwe concedes none of the exceptions, specifically the "vehicle liability" exception,[77] applies to Monroeville. Based on the facts here, it is immune from liability under the Tort Claims Act. We grant summary judgment in Monroeville's favor on this claim.

### C. Fact issues preclude summary judgment on *Monell* claim against Monroeville.

Monroeville moves for summary judgment arguing Mr. Igwe failed to adduce sufficient evidence to raise a genuine issue of material fact based on any policy, custom or practice causing a constitutional violation; any failure to train or failure to supervise theory; and any conscience shocking behavior required to establish a constitutional right.

In *Monell*, the Supreme Court held a municipality may be liable under § 1983 when its policy or custom causes the constitutional violation.[78] To succeed on a *Monell* claim, Mr. Igwe must establish Ms. Robinson: "(1) possessed a constitutional right of which she was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to deliberate

indifference' to her constitutional right; and (4) the policy [or custom] was the 'moving force' behind the constitutional violation."[79]

In this Circuit, a municipality may be independently liable even where none of its employees are liable.[80] Under *Fagan*, a municipality "can independently violate the Constitution if it has a policy, practice, or custom of deliberate indifference that causes the deprivation of some constitutional right through the actions of an officer, the 'causal conduit.'"[81]

Mr. Igwe bases his *Monell* claim on a failure to train and failure to supervise based on Officer Skaggs's culpability as well as under a *Fagan* theory of liability. We find genuine issues of material fact preclude summary judgment including Officer Skaggs's subjective belief to determine the culpability standard for conscience shocking behavior required to prove a *Monell* claim and whether Monroeville failed to train its officers on how to operate their police vehicles when responding in "Emergency Response mode" as distinguished from pursuit.

### D.  We grant Global's motion for summary judgment.

Global moves for summary judgment on Mr. Igwe's strict products liability claim under a design defect and failure-to-warn theory. Mr. Igwe appears to advance both a defective design and failure-to-warn theory to show the Opticom system is defective because it can be "out run." We find no genuine issue of material fact and grant Global's motion.

### 1.  We grant summary judgment to Global on the design defect theory.

In *Tincher v. Omega Flex, Inc.*,[82] the Pennsylvania Supreme Court ruled strict products liability claims are governed by the Restatement (Second) of Torts, § 402A. To prevail on a strict liability claim, a plaintiff must prove "the product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm."[83] A product may be defective based on a manufacturing defect, design defect, or failure-to-warn defect.[84]

The Pennsylvania Supreme Court's *Tincher* decision set out two standards to show a product is in a "defective condition" in the design defect context: the consumer expectation standard and the risk-utility standard.[85] The question of "[w]hether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue."[86]

Under the consumer expectation standard, "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer."[87] In *Tincher*, the Pennsylvania Supreme Court expressed the test "as reflecting the 'surprise element of danger.'"[88] A product "is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains . . .."[89] Considerations such as the nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are relevant to assessing the reasonable consumer's expectations.[90]

Under the risk-utility standard, the "product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of the harm caused by the product outweigh the burden or costs of taking precautions."[91] Factors to determine the risk-utility test are: "(1) the usefulness and desirability of the product - its utility to the user and to the public as a whole; (2) the safety aspects of the product - the likelihood that it will cause injury, and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product;

(6) the user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (7) the feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."[92] Mr. Igwe references the risk-utility standard, but offers us no evidence or analysis.

In opposition to summary judgment on a defective design theory, Mr. Igwe argues the application of the consumer expectation standard and the considerations used to assess the reasonable consumer's expectations. Mr. Igwe points to Global's marketing literature explaining the Opticom system provides a "safe 'green light' corridor along the response route"; use of the Opticom system "by placing temporary command of the intersection with the emergency vehicle operator, will result in safer priority movement and accident reduction"; and other representations made by Global's literature regarding the safety provided by the Opticom system.

Mr. Igwe offers no evidence of defective design under the consumer expectation standard or the risk-utility standard. Under the consumer expectation standard, Mr. Igwe must show defective condition from a danger that is "unknowable and unacceptable to the average or ordinary consumer." Mr. Igwe argues the Opticom system is defectively designed because it can be "out run," citing only to the marketing material referring to the system's ability to provide a "safe green light" along an emergency response route.

Global's marketing material does not create an issue of material fact regarding design defect. First, there is no dispute the Opticom system does not change the traffic signal. The Opticom system consists of three component parts; an emitter, a detector, and a phase selector.[93] A "traffic controller" device, which Mr. Igwe admits is owned and maintained by Monroeville

and not Global, determines if and when a traffic signal will change.[94] Second, Mr. Igwe's expert, Mr. Ferrone, opined "[i]t has been verified that the Opticom system, at the collision intersection was working properly at the time of the accident. A "preemption" was registered confirming its function."[95] Mr. Ferrone attributed the defect to the ability to "out run" the system but at the same time opined the defect "cannot be reasonably designed out based on the technology used at the time of production."[96]

Finally, Officer Skaggs testified he knew the Opticom system could be out run and was aware of Monroeville's Policy warning the Opticom system could be out run.[97] Officer Skaggs also testified he did not rely on the Opticom device to turn the light green the day of the collision.[98] There is no dispute Monroeville's Policy contains a section on the Opticom system warning: "Opticom can be over run by increasing the speed of the emergency vehicle using the device. No set speed has been determined, however you are warned not to anticipate the light changing." Mr. Igwe admits Monroeville provided Officer Skaggs with Monroeville's Policy, including the section on Opticom and the warning it could be over run, and instructed Officer Skaggs to read and review the Policy.[99]

The record notwithstanding, Mr. Igwe argues the Opticom system is defective because Officer Skaggs did not have proper warning as to the dangers of over running the signal. To show design defect under the consumer expectation standard, Mr. Igwe must show the danger of over running is "unknowable and unacceptable to the average or ordinary consumer." The record shows Officer Skaggs knew the Opticom system could be over run. The record additionally confirms Monroeville Police Officers Frisk[100] and Supancic[101]; Police Chief Cole[102]; and Dominick LaGorga, all knew the Opticom system could be over run. We find no issue of material fact regarding a design defect as there is no dispute the danger of over running the

Opticom system is known to Monroeville's Police Department and Public Works; there is no "unknowable and unacceptable" danger. With no evidence to support a defective design claim, we grant summary judgment in favor of Global on a defective design theory.

### 2. We grant summary judgment on a failure-to-warn defect claim.

We find the heart of Mr. Igwe's argument to be a failure-to-warn claim. As our colleague Judge Schiller found in *Hatcher v. SCM Group North America, Inc.*,[103] we find Mr. Igwe "conflates failure-to-warn defects with design defects."[104] As Judge Schiller found in *Hatcher*, "[w]hile Pennsylvania courts in the past have treated failure-to-warn claims as a category of defective design claims, this does not mean that every failure-to-warn claim automatically gives rise to a supplemental design defect claim."[105]

Under Pennsylvania law, "an otherwise properly designed product may still be unreasonably dangerous (and therefore 'defective') for strict liability purposes . . . if the product is distributed without sufficient warnings to apprise the ultimate user of the latent dangers in the product."[106] "In a failure-to-warn case, the threshold determination is whether the product is defective for lack of sufficient warnings."[107] Mr. Igwe must show Global sold the Opticom system without sufficient warnings to "adequately notif[y] the intended user of the unobvious dangers inherent in the product" and may recover only if "the lack of warning rendered the product unreasonably dangerous."[108]

Mr. Igwe must also show causation in a failure-to-warn claim by demonstrating "the user of the product would have avoided the risk had he or she been warned of it by the seller."[109] In other words, Opticom may be liable on the failure-to-warn claim "only when there is sufficient evidence that additional warnings or reminders may have made a difference."[110]

Mr. Igwe argues there is an inherent delay in the Opticom system causing an over run

hazard which he argues Global is obligated to warn against and properly train the system's users. Mr. Igwe argues Global could have, but failed, to place warning stickers or placards inside emergency vehicles equipped with the Opticom system to warn of the over run possibility; Global's "timing chart" is insufficient because it does not provide data for vehicles travelling in excess of 70 miles per hour; and there is no evidence the Instructor Guide or any other Global "training materials" were ever provided to Monroeville and, even if provided, do not amount to an effective warning. Mr. Igwe contends the record "contains evidence from which a jury could reasonably find" Monroeville, as a purchaser of the Opticom system, and its employees "were not aware of the hazard to the full extent that an adequate warning might have provided" and a jury "might find that if Officer Skaggs had received a proper warning as to the dangers of overrunning the signal or if he had undergone the [Instructor Guide] or any other Driving Training Programs, . . . he might have properly operated his vehicle on the date of this incident and not 'overrun' the signal."

Even construing these facts in favor of Mr. Igwe, there is no genuine issue of material fact on his design defect or failure-to-warn defect claims. At bottom, the undisputed facts show: (1) Monroeville's Policy warned its officers the Opticom system can be over run as speed increases; no set speed at which an over run can occur has been determined; and officers are not to anticipate the light changing; (2) Officer Skaggs testified he knew the Opticom system could be over run; (3) Two other police officers, the Police Chief, and senior foreman of public works for Monroeville all knew the Opticom system could be over run; and (4) Officer Skaggs did not rely on the Opticom system on the day of the incident. Although there are questions of whether Monroeville received additional materials and training from Global, there is no question Monroeville knew of the Opticom system over run possibility and included a warning about it in

the Monroeville Policy on which its officers were trained and directed to read and review. We know of no authority, and Mr. Igwe does not point us to any, requiring a product seller to provide of myriad of similar worded warnings when its issued warning, as understood by the buyer, addresses the alleged defect. We decline to require redundant warnings when the undisputed evidence confirms the purchaser knew and adopted the warning in its policies. Summary judgment is entered in favor of Global on Mr. Igwe's strict products liability claim under a design defect or failure-to-warn theory.

### 3. We enter summary judgment for Global on the negligence claim.

Mr. Igwe seeks to hold Global liable in negligence for: negligently designing, manufacturing, distributing, selling, maintaining, and/or delivering the Opticom system in a defective condition; failing to act reasonably to eliminate or reduce the risks and hazards associated with using the Opticom system; failing to act reasonably to advise Skaggs and Monroeville of the risks and hazards associated with using the Opticom system; failing to act reasonably to advise Skaggs and Monroeville "as to the steps to be taken to avoid injuring" Ms. Robinson during the use, operation, and maintenance of the Opticom system; failing to properly test and inspect the Opticom system to detect any safety hazards inherent in the Opticom system; failing to train, instruct or otherwise direct users of the Opticom system with regard to safe methods of operation; failing to properly maintain the Opticom system after its installation; and the Opticom system "was not safe for its ordinary and intended use."[111]

Global seeks summary judgment arguing Mr. Igwe failed to establish a design defect in the Opticom system; failed to establish Global failed to sufficiently train, warn, or advise on the proper use of the Opticom system; and failed to show Opticom caused the collision. In response, Mr. Igwe argues the only difference in the issues of the negligence analysis versus the strict

liability analysis is whether Global owed a duty of care.[112] Mr. Igwe argues Global, as the manufacturer, has a duty of care to provide adequate warnings and instructions on the proper use of its product and this duty is established as a matter of law in Pennsylvania. Mr. Igwe does not add new argument in support of his negligence claim, relying on his arguments in support of his strict products liability claim.

To prevail on his negligence claim, Mr. Igwe must show (1) Global owed a duty of care; (2) the breach of the duty; (3) causation; and (4) damages.[113] Under Pennsylvania law, strict liability and negligence are distinct legal theories.[114] Unlike strict liability, negligence "revolves around an examination of the conduct of the defendant."[115] "[T]he standard for establishing liability of a product manufacturer under a negligence theory would be more stringent and, thus, more difficult to satisfy."[116] A claim for negligence on a failure-to-warn theory under Pennsylvania law "requires a showing, unlike in a strict products liability claim, that the manufacturer was at fault" . . . "[b]ut, as in the case with a strict products liability claim for failure-to-warn, a plaintiff must also show that the absence or inadequacy of the warnings was the factual or proximate cause of the injury."[117] "The initial determination of whether a warning is adequate in Pennsylvania is a matter of law."[118]

For the reasons above, Mr. Igwe failed to show evidence of a genuine issue of material fact for trial on his design defect and failure-to-warn claims. Under the consumer expectation standard, Mr. Igwe must show defective condition from a danger that is "unknowable and unacceptable to the average or ordinary consumer." In the failure-to-warn defect claim, Mr. Igwe must show Global sold the Opticom system without sufficient warnings to notify Monroeville of "unobvious dangers inherent" in the system rendering it "unreasonably dangerous." As set out above, the record shows Monroeville's Policy contained a warning the Opticom system could be

over run "by increasing the speed of the emergency vehicle using the device. No set speed has been determined, however you are warned not to anticipate the light changing" and Officer Skaggs knew the Opticom system could be over run. Absent a genuine issue of material fact, we enter summary judgment in Global's favor on Mr. Igwe's negligence claim.

### III. Conclusion

In the accompanying Order, we grant Global's motion for summary judgment in its entirety and enter judgment in its favor on Counts VI and VII. We grant summary judgment in favor of Monroeville as to punitive damages only on the state law vicarious liability claim (Count II) and, as conceded by Mr. Igwe, on the state law negligence claim (Count III). We deny summary judgment on the *Monell* claim against Monroeville in Count V and as to punitive damages on the negligence claim against Officer Skaggs in Count I.

---

[1] Our Policies require a Statement of Undisputed Material facts ("SUMF") and an appendix in support of summary judgment. Defendants Jeremy Skaggs and the Municipality of Monroeville filed their SUMF (ECF Doc. No. 71) and appendix (ECF Doc. Nos. 72, 102). Plaintiff Anthony Igwe responded to Skaggs/Monroeville's SUMF, added additional facts he contends are material to summary judgment, and supplemented the appendix with additional exhibits (ECF Doc. Nos. 92, 94). Defendants Global Traffic Technologies, Inc. and Global Traffic Technologies, LLC (collectively "Global") filed its SUMF (ECF Doc. No. 67) and appendix in support of summary judgment (ECF Doc. Nos. 66, 97). Mr. Igwe responded to Global's SUMF, added additional facts he contends are material to summary judgment, and supplemented the appendix with additional exhibits (ECF Doc. Nos. 89, 91). References to exhibits in the appendices shall be referred to by Bates number, for example, "1a."

[2] Skaggs/Monroeville SUMF at ¶ 1 (ECF Doc. No. 71).

[3] Second Amended Complaint at ¶ 54 (ECF Doc. No. 33).

[4] *Id.* at ¶ 23.

[5] *Id.* at ¶ 25.

[6] Skaggs/Monroeville SUMF at ¶ 101.

[7] *Id.* at ¶ 103.

[8] *Id.* at ¶ 105.

[9] *Id.* at ¶ 104.

[10] *Id.* at ¶¶ 109-110.

[11] *Id.* at ¶ 113.

[12] *Id.* at ¶ 111.

[13] *Id.* at ¶¶ 73, 121.

[14] *Id.* at ¶ 118.

[15] *Id.* at ¶ 78. There is no dispute the audio recording is "true and accurate of the audio or radio transmissions from the incident of December 8, 2014." *Id.*; audio recording at Skaggs/Monroeville Appendix 48a.

[16] *Id.* at ¶ 79. Mr. Igwe does not deny this fact. *See* Igwe's Response to Skaggs/Monroeville SUMF at ¶ 79 (ECF Doc. No. 92).

[17] Skaggs/Monroeville SUMF at ¶¶ 119, 123.

[18] *Id.* at ¶ 124.

[19] *Id.* at ¶ 125.

[20] *Id.* at ¶ 118.

[21] *Id.* at ¶ 95.

[22] *Id.* at ¶ 94.

[23] *Id.* at ¶ 137.

[24] Global Appendix at 544a-545a.

[25] Skaggs/Monroeville SUMF at ¶ 82. There is no dispute a video recording from the in-car camera located in Officer Skaggs's patrol vehicle recorded the events of December 8, 2014 and is "a true and accurate depiction of what occurred as can be viewed from his vehicle." *Id.* at ¶ 77; video recording at Skaggs/Monroeville Appendix 47a.

[26] Skaggs/Monroeville SUMF at ¶¶ 84-85.

[27] Global SUMF at ¶ 12.

[28] *Id.* at ¶ 14.

[29] *Id.* at ¶ 15.

[30] *Id.* at ¶ 16.

[31] *Id.* at ¶ 17.

[32] *Id.* at ¶ 18.

[33] *Id.* at ¶ 19. Mr. Igwe concedes the traffic controller us owned and maintained by Monroeville. *See* Igwe's response to Global's SUMF at ¶ 19 (ECF Doc. No. 89).

[34] Global SUMF at ¶ 20. Mr. Igwe concedes the traffic control signal sequence is determined by PennDot. *See* Igwe's response to Global's SUMF at ¶ 20.

[35] Global SUMF at ¶ 21.

[36] *Id.* at ¶ 22.

[37] *Id.* at ¶ 28.

[38] Global Appendix at 329a.

[39] *Id.* at 332a-346a; Global SUMF at ¶ 29.

[40] Global Appendix at 347a.

[41] *Id.*

[42] *Id.* at 349a-350a.

[43] *Id.* at 351a,

[44] *Id.* at 353a.

[45] *Id.* at 354a.

[46] *Id.* at 355a-356a.

[47] *Id.* at 363a.

[48] *Id.*

[49] Global SUMF at ¶ 30; Global Appendix at 350a.

[50] Global SUMF at ¶ 23. Mr. Cosgrove is self-described as "semi-retired" from Global as of October 2015, and continues to perform consulting work for it. Global Appendix at 685a-686a. Mr. Cosgrove began his employment with 3M on the Opticom system in 1998. *Id.* at 687a.

[51] Global SUMF at ¶ 24.

[52] Global Appendix at 1007a.

[53] *Id.*

[54] *Id.* at 952a, 954a.

[55] Skaggs/Monroeville Appendix at 28a.

[56] *Id.* at ¶ 27.

[57] Global Appendix at 855a.

[58] *Id.* at 446a-447a. Mr. Igwe additionally cites the deposition testimony of Brian Vanderbosh, Global's Chief Financial Officer, for his contention Global only provided the Instructor Guide if a customer requests it. *See* Igwe's response to Global's SUMF at ¶ 28. Upon review of the testimony, however, Mr. Vanderbosh testified it is not Global's practice to "actively go out and train drivers unless we're requested to do so by the city." Global Appendix at 604a-605a. Mr. Vanderbosh did not testify the Instructor Guide is only provided if a customer requests it; he testified:

> Q. What, if anything, does [Global] do to advise the EMS worker, the police officer, the fireman, the municipality, by the way, even though this process is going on, we're not guaranteeing that the light will be green, if anything? And if they don't do anything, that's fine too. I'm just trying to find out what, if anything, they do.
>
> [Objection]
>
> A. So our manuals and literature do describe the variables in whether or not a vehicle will get a green light. We don't – if a city asks us to explain to drivers what those variables are that will lead to getting or not getting a green light, we will do that, but we don't, as a matter of practice, actively go out and train drivers unless we're requested to do so by the city.

*Id.*

[59] Global Appendix at 858a-889a; 890a-894a; and 895a-900a.

[60] *Id.* at 848a.

[61] *Id.* at 849a-852a.

[62] Skaggs/Monroeville Appendix at 1a.

[63] *Id.*

[64] *Id.* at 5a.

[65] *Id.* at 6a.

[66] 75 Pa.C.S.A. § 3015(e).

[67] Skaggs/Monroeville Appendix at 10a.

[68] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 313 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[69] Second Amended Complaint at ¶ 150.

[70] On January 30, 2017, we dismissed Mr. Igwe's § 1983 state-created danger claim against Officer Skaggs (Count IV) under qualified immunity (ECF Doc. No. 49).

[71] 42 Pa. C.S.A. §8542.

[72] *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984).

[73] *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005) (citation omitted).

[74] 42 Pa. C.S.A. § 8553, *The Choice is Yours, Inc. v. The Choice is Yours*, No. 14-1804, 2015 WL 5584302, at * 8 (E.D. Pa. Sept. 22, 2015).

[75] 42 Pa.C.S.A. § 8541.

[76] *Lockwood v. City of Pittsburgh*, 751 A.2d 1136, 1139 (Pa. 2000).

[77] 42 Pa.C.S.A. § 8542(b)(1).

[78] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[79] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91)).

[80] *Fagan v. City of Vineland*, 22 F.3d 1283(3d Cir. 1994) (*"Fagan I"*); *Fagan v. City of Vineland*, 22 F.3d 1296 (3d Cir. 1994) (*"Fagan II"*).

[81] *Washington-Pope v. City of Phila.*, 979 F.Supp. 2d 544, 576 (E.D. Pa. 2013); *see also Cook v. West Homestead Police Dept.*, No. 16-1292, 2017 WL 1550190 (*4-*7) (W.D. Pa. May 1, 2017) (applying *Fagan* to deny motion to dismiss *Monell* claim against borough for failing to properly implement, enforce, or maintain a policy for traffic stops and high speed pursuits and/or failing to train officers in any such policy to avoid high speed pursuit through populated thoroughfares).

[82] 104 A.3d 328 (Pa. 2014).

[83] *High v. Pennsy Supply, Inc.*, 154 A.3d 341, 345-46 (Pa. Super. 2017) (quoting *Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 354-55 (Pa. Super. 2015)); *Punch v. Dollar Tree Stores, Inc.*, No. 12-154, 2017 WL 752396, * 7 (W.D. Pa. Feb. 17, 2017) (citing *Wright v. Ryobi Techs., Inc.*, No. 15-1100, 2016 WL 1241860, at *5 (E.D. Pa. Mar. 30, 2016)).

[84] *High*, 154 A.2d at 346 (citing *Weiner America Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. 1998)).

[85] *Tincher*, 104 A.3d at 387.

[86] *Id.*, at 335.

[87] *Id.* at 387.

[88] *Id.* (citations omitted).

[89] *Id.* (citations omitted).

[90] *Id.* (citations omitted).

[91] *Id.* at 389 (citations omitted).

[92] *Id.* at 389–90.

[93] Igwe response to Global SUMF at ¶ 15.

[94] *Id.* at ¶ 20.

[95] Global Appendix at 119a.

[96] *Id.* at 121a-122a.

[97] *Id.* at 445a-446a; 453a.

[98] *Id.* at 544a-545a.

[99] Skaggs/Monroeville SUMF at ¶ 49; Igwe's response to Skaggs/Monroeville SUMF at ¶ 49.

[100] Global Appendix at 942a.

[101] *Id.* at 979a.

[102] *Id.* at 1014a, 1036a.

[103] 167 F.Supp.3d 719 (E.D. Pa. 2016).

[104] *Id.*, at 724.

[105] *Id.*, at 725.

[106] *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998); *Punch,* 2017 WL 752396, at *14 (citing *Pavlik*).

[107] *Hatcher*, 167 F.Supp. 3d at 725.

[108] *Id.* (citing *Mackowick v. Westinghouse Elec. Corp.*, 575 A.2d 100, 102 (Pa. 1990) and *Barton v. Lowe's Homer Ctrs., Inc.*, 124 A.3d 349, 355 (Pa. Super. 2015)); *see also Phillips v. A-Best Prod. Co.*, 665 A.2d 1167, 1171 (Pa. 1995) (to establish a product is defective under a failure-to-warn claim, plaintiff must show "a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product 'unreasonably dangerous'").

[109] *Phillips*, 665 A.2d at 1171.

[110] *Flanagan v. martFIVE, LLC*, No. 16-1237, 2017 WL 1316370, at *4 (W.D. Pa. Apr. 10, 2017) (citing *Conti v. Ford Motor Co.*, 743 F.2d 195, 199 (3d Cir. 1984)). Mr. Igwe argues he is entitled to a "heeding presumption." Under Pennsylvania law, a "heeding presumption" is applied to presume "[w]here a warning is given, the seller may reasonably assume that it will be read and heeded." *Flanagan*, at * 4 (quoting *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997); *see also Pavlik*, 135 F.3d at 883 (quoting comment to the Restatement (Second) of Torts § 402A). In its 1998 *Pavlik* decision, our Court of Appeals predicted the Pennsylvania Supreme

Court would adopt a rebuttable heeding presumption "as a logical corollary to comment j." *Id.* at 883. The presumption "assists the failure to warn plaintiff in satisfying his burden of showing proximate cause," however "it does not change the fact that he still bears the burden of persuasion on the causation prong of his § 402A claim." *Pavlik*, 135 F.3d at 883.

[111] Second Amended Complaint at ¶ 157.

[112] Mr. Igwe cites *Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349 (Pa. Super. 2015) in support of his argument manufacturers owe a duty to include instructions on the proper use and maintenance of its product. Several factors render *Barton* not relevant here. First, the case was decided on preliminary objections for failure to state a claim under Pennsylvania law and not decided at the summary judgment stage. Second, Global does not seek summary judgment based on a lack of duty; it seeks summary judgment because there is no evidence the Opticom system is defectively designed or Global failed to warn or train on the proper use of the system.

[113] *Kline v. Zimmer Holdings, Inc.*, 662 F.App'x 121, 123 (3d Cir. 2016) (citing *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003)); *Wright*, 175 F.Supp. 3d at 454 (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 61 (3d Cir. 2009)).

[114] *Phillips*, 841 A.2d at 1008.

[115] *Id.*

[116] *Schwartz v. Abex Corp.*, 106 F.Supp. 3d 626, 654 (E.D. Pa. 2015) (citing *Tincher*, 104 A.3d at 364, 401); *Punch*, 2017 WL 752396, at * 13.

[117] *Wright*, 175 F.Supp. 3d at 455 (citations omitted).

[118] *Id.* (citing *Pavlik*, 135 F.3d at 886).